Good morning, Your Honors. I'm Drew Caputo. I represent the Natural Resources Defense Council and Oceana in this case. I'm hoping to reserve about five minutes of my time for rebuttal. Congress amended the Magnuson Act in 1996 through passage of the Sustainable Fisheries Act. A main motivation behind those amendments was Congress's desire to end existing delays in ending overfishing and rebuilding overfished species. The National Marine Fisheries Service, or NMFS, acknowledges that congressional motivation behind the 96 amendments. To accomplish its goal of ending delays and expediting rebuilding of overfished species, Congress enacted the rebuilding requirements of the Act that are at issue in this case. Congress also enacted at the same time the statutory prioritization of conservation over economics, which is also at issue in this case. There's a basic conflict between, on the one hand, Congress's desire to end delays and expedite rebuilding, and on the other hand, the action that NMFS took here, which was to delay rebuilding of dark blotched rockfish and overfished species by many years because of the agency's decision to increase fishing pressure on the species by 29 percent, or nearly one-third in the space of one year, and to take those decisions not just in spite of, but because the agency just learned that the species was much more than the agency had understood a year previously. Now, that chain of decision-making is not just counterintuitive and counterproductive. It's exactly the type of fishery management that Congress wanted to bar when it enacted the rebuilding requirements of the Act as part of the Sustainable Fisheries Act. The agency's key defense here is a series of arguments about agency discretion. But the very purpose of the rebuilding requirements of the Act is to constrain the agency's discretion to do exactly what the agency did here, to delay rebuilding an overfished species in order to serve the short-term economic interests of the fishing industry. For healthy species, the agency is exactly right that the statute gives it considerable discretion, not limitless discretion, but considerable discretion, to weigh economic and environmental factors and set fishing harvest levels. Certainly. Wait a minute. When you say healthy species, the statute as a condition says it has to be an overfished species before any of this takes place. The statute regulates healthy fisheries and overfished species, Your Honor. Well, we're talking about, at least I want to make sure I'm following your argument, it says for a fishery that is overfished, and then we get into the two clauses that we're dealing with in this case. That's correct, Your Honor. And that's exactly my point, is that those clauses only apply to overfished species. Yes. So the agency also regulates other species, and the rest of the requirements of the Act apply to those species. And my point in this context is that for those other healthy species, the agency is right that it has considerable discretion to weigh economic and environmental factors. But overfished species Some discretion here. I mean, the statute says that it has to be as short as possible, and it allows them to take into account the status and biology of the overfished stocks of fish, the needs of the fishing communities and international organizations. And it gives them the out on the second clause about not exceeding 10 years except where the biology of the fish or environmental conditions require it. And I understand them in this case to be dealing with that second clause where the biology of the fish, they say, requires extending beyond 10 years. Is that not what we're talking about? That's certainly the central issue in the case, Your Honor, is those two subparagraphs, what we call subparagraph 1 or little i and subparagraph 2 or double little i, depending on how you read the symbols. And I don't want to throw you off, but just to help me understand your approach here, they went through rulemaking to come up with this formula that they've applied here. And one of the questions I have that I hope both sides will address is, when we evaluate what has done here, do we look at the regulation as a process and a paradigm that they've set up to deal with this little i, clause 2, and decide whether or not it's reasonable in general, or do we look at it as applied in this case? It may make sense in some cases as applied, but as applied here, it comes up with what appears to be a counterintuitive result. Yeah. The short answer to your question, Judge Fischer, is that this is an as-applied challenge. We're challenging the application of what's not a regulation, but is a guideline, an advisory guideline under the terms of the statute to these specific facts. Okay. And my point earlier was that the statute treats overfish species different by subjecting them to a series of very prescriptive requirements that include these requirements on the length of the rebuilding period, which is what we're arguing about in this case, for two reasons, I think. One is that overfish species, by definition, need more protection than other species. And the other is that overfish species are the species for which NMFS's management, by definition, has been inadequate and ineffective. And that's why, unlike in the other areas of the statute, Congress put together these very prescriptive requirements for the agency's management of those species that constrain the agency's discretion. Now, we've presented a statutory interpretation of those rebuilding requirements that yields a symmetrical and a coherent regulatory scheme. Those arguments are based on the text of the statute, the structure of the statute, and the legislative history. The agency, of course, has a competing statutory interpretation, but that statutory interpretation suffers from a series of crucial flaws. A crucial flaw is that in subparagraph 2, as Judge Fisher just adverted to, the plain purpose of that subparagraph is to erect an outer boundary beyond which the agency can't go in extending a rebuilding period. That section of the statute makes no sense as anything else. The agency's interpretation of the statute effectively renders that subparagraph a nullity for the most overfish species by removing all statutory limits on the outer edge of a rebuilding period. Now, that's an unreasonable reading of the statute, particularly given the congressional goal that we have to read the statute in light of, which was ending delays in overfishing and expediting rebuilding. Explain what you mean by removing all outer limits. The only limit under the agency's interpretation, if it's impossible to rebuild within 10 years, is what the agency reads as this weighing process under subparagraph I. And one way to see how unreasonable that reading is, in addition to not giving any concrete effect to subparagraph II, is to look at the irrational results it yields. We talked particularly in our opening brief about how the agency's interpretation, by essentially deleting subparagraph II from the statute, if it's impossible to rebuild within 10 years, that the effect of that statutory interpretation is to generate widely varying rebuilding periods, rebuilding periods that literally vary by decades. But I thought it was tied to the biological life of regeneration life of the fish. That's the agency's thesis about how long it can extend the rebuilding period. But positive. Does that set a limit, though? Isn't that a? I'm sorry, Your Honor. Doesn't that set some limit under subsection VIII? The agency's interpretation says, yes, if we get past the 10-year gate, we can extend it literally by decades. Well. But our current interpretation means that we couldn't extend it by 1,000 years. They have a limit in their guidelines, but they read the statute, which is the key issue, since the agency can and does move around its interpretation of the statute. They read the statute as placing no outer limit on the rebuilding period. Help me understand your reading of the statute. It's divided into little I and then two little I. The second little I, the period when it goes past 10 years. The first one says, as short as possible not to exceed 10 years. You get to take the following factors into account. But if you can't do it within 10 years, you don't have to. And they make exception for biology, the stock of the fish, other environmental conditions, or management measures that dictate otherwise. If we're kicked into the double I, that is to say we're over the 10-year period, under your reading of the statute, is any fishing allowed of this depleted species? Under our reading of the statute, if it's biologically impossible to rebuild within 10 years, you have to stop fishing and do what is biologically possible. And even then, when you say stop fishing, do you also mean no bycatch? It's not clear to me your, I don't know the answer to that. This dark blotched rockfish is not a target species. It's a bycatch species. Primarily a bycatch species, that's exactly right. I think the statute directs the agency to minimize bycatch. So I think it's an open question whether the agency could interpret the statute as permitting a de minimis amount of bycatch mortality on a species like dark blotched rockfish in order to, as part of a rebuilding program. And they could do that in order to respond to the, quote, needs of fishing communities? Well, that might be one rationale. It might also be a practical rationale. Is that a permissible rationale that needs of fishing communities may be taken into account, even if we've exceeded the 10 year period? I think the answer to the question, Your Honor, is that the, once they're past the 10 year period, they have to shut off the fishing of that species. No, you're sliding off me again. Shut it off entirely, including bycatch? You just said no, they maybe can have some bycatch. What do you mean shut off fishing? I think they need to do all they can to shut the bycatch mortality that would affect the overfished species also. Well, all they can is they can simply say, well, if there's going to be any bycatch at all, you're not going to fish for these species. Okay, you can fish for salmon, but you can't go down to the bottom and get these bottom fish. I mean, that would work pretty well. But I doubt that's the position that the NMFS is going to like that much. I suspect that's also, Your Honor. That would be one permissible interpretation of the statute. I think they also, as I said earlier, I think the agency also could potentially persuade a court that if they're managing the fishery in as rigorous a way as is practically possible, and they're catching a few dark blotched rockfish around the margins, I mean truly de minimis, that they can comply with their statutory duty under the rebuilding requirements not to add time to the to minimize bycatch and only catch a few of these bycatch species. Also important on this issue, which I think you're properly raising, Your Honor, is as a practical matter, I think the record indicates that it's feasible to shut down fishing for dark blotched rockfish while keeping fishing for other fish. It certainly hasn't been proven the otherwise. The record, among other things, indicates that these bycatch problems occur seasonally because the fish interact in the same area in different ways from season to season. So it's perfectly feasible, it may be perfectly feasible for the agency to allow healthy fisheries for healthy species during portions of the year where they don't interact with dark blotched rockfish. One of the reasons why we asked the district court to bifurcate liability and remedy is that we wanted to have an evidentiary proceeding on exactly that issue in the district court as part of crafting a remedy. This is a slightly different question, and I'm not sure how legally tight, how relevant it is. Who sits on this council? It's a good question, Your Honor. The federal government does in the form of the National Marine Fisheries Service. The states which are in the region, so in the Pacific Fishery Management Council, the states of California, Oregon, and Washington all have seats. Idaho also has a seat because the council manages salmon and the spawning streams are in Idaho. And then there are a series of appointed members. And almost all or almost all of those members on this council are representatives of the fishing industry. And how many voting members are there on the council? I'd be guessing, Your Honor, I'm guessing a dozen, roughly. But I made that number up, and I'd be happy to apprise the court of the answer to that question. Okay, I'm sure I can find that out on my own. Okay. So we were talking before this line of questioning about why the agency's statutory interpretation is unreasonable. The first reason is not giving effect to an outer limit on rebuilding. The second reasoning is the irrational results it yields by generating these widely varying rebuilding periods. The third reason is that the interpretation allows the agency to decrease protections for an overfish species, which is exactly what happened here. And if the rebuilding requirements of the act mean anything, they have to mean that the agency can't weaken protections for an overfish species. Especially as on the facts here, where the agency just found out that the species is much more overfished than the agency previously understood. I noticed in the briefs that there's some discussion as to whether Chevron deference applies. Assuming for the sake of argument that it does, would you give me your best argument, and maybe you just have, why the 2002 regulations can nonetheless not survive? Certainly, Your Honor. If Chevron deference applies, the agency's statutory interpretation still should be rejected if the interpretation is either unreasonable or if it frustrates the congressional policy in enacting the statute. Because the very – because the effect of the policy here is to delay rebuilding for this species, which would have been rebuilt much more quickly if the agency hadn't weakened protections, it frustrates the Congress's policy of enacting the Sustainable Fisheries Act. It's also an unreasonable reading of the statute for the reasons I listed earlier. Reading the outer limit out of the statute and yielding irrational results and allowing the agency to weaken protections. I'll quickly run through my fallback. Just one follow-up question on that. Does your suggestion that the fishing quotas should not be afforded Chevron deference because it mechanically follows the sort of the impermissible NST, doesn't this provide a powerful incentive for NMFS not to issue guidelines in the first place? And wouldn't that lead to a more secret kind of process than we have now? The statute requires the agency to issue those guidelines. That's why the agency issued them. So it has a statutory obligation to issue them. And I think the purpose of the provision in the statute that says that the guidelines are advisory and that they lack the force of law, I think that Congress was being purposeful in that, that the agency, that Congress wanted the agency to issue guidelines about its interpretation of the statute so that those guidelines could guide the decisions of the regional fishery management councils. Because the management system has these decisions starting with the councils, which then submit these proposals to NMFS for decision. But the Congress wanted to preserve for the courts the ability to decide exactly what the law means, which is why it deemed that the guidelines are advisory and lack the force and effect of law. Thank you. Okay. Go ahead. I think I'm going to reserve the rest of my time. Why don't you do that, and then you can hear what the other side says, and you can respond. Could I just take a little time off on my account, then? You keep saying that they remove the outer limits, and I'm still not sure I understand that. Because you say this is an as-applied case, and at least in this case, that the outer limit establishes the function of the formula that they apply, having to do with the biology of the fish. Why does that remove the outer limit? There are two — there can be two outer limits here. One is an outer limit that's imposed by the statute, and the other is an outer limit that's imposed voluntarily by the agency because of an interpretation it creates in the National Standard guidelines or elsewhere. When I say reading out of the statute, what I'm saying is it's reading the statutory limit, which is contained in subparagraph 2, and obviating it for purposes of management. You're correct that the agency says, well, but even under our interpretation, we can't extend the rebuilding period indefinitely. And that's true as far as it goes, but there are two problems with that argument. Number one is that the agency's interpretation is very expansive. It may be, but it's not taking the limits out entirely. I mean, sub 2 says not to exceed 10 years except. So by its own language, contemplates that they can go beyond 10 years, correct? Certainly, Your Honor. But our reading of the statute is the purpose of subparagraph 2 in order to check the agency's discretion is to create some hard limit beyond which the agency can't go. That hard limit — What is the statutory hard limit? The statutory hard limit is either 10 years, or if 10 years is impossible, what is possible? And the agency's interpretation says that once you're past the 10-year gate, no statutory limits whatsoever apply. And what would your — so, and what I'm still trying to say as applied here, you say it can't be done in 10 years, everybody agrees with that, it's at least 14 or whatever. It can be done in 14. So the way we read the statute — Well, they can't shut the fishing down. They can't extend to 14 years. They have to shut fishing down. They have to rebuild within 14 years. And just to briefly give you the textual logic behind that, what the statute says is you have to — you can't go past 10 years unless you have to go past 10 years. And if you have to go past 10 years, then you get to follow the thing that is possible. If 10 years is impossible, you get to follow what is possible. Okay, thank you. Thank you. May it please the Court, I am David Shilton from the Department of Justice representing the National Marine Fisheries Service. With me at council table is James Walsh, who will be taking three minutes of our time. He represents intervener seafood processors. Also in the Court today is Eileen Cooney from the General Counsel's Office of the NOAA, which is the agency over NIFS. NIFS in this case recognized that there are more than one possible interpretation of subsection 2i of section 1854 E4a. That subsection says that rebuilding periods shall not exceed 10 years, except in cases where the biology of the fish stock, environmental conditions, or international — or management measures under an international agreement dictate otherwise. The question that raises is whether — what are the appropriate figures for setting the outer bound where you have the situation where biological factors mean that you have to go over 10 years. And so that's what NIFS focused on in its notice and comment rulemaking. And it concluded that the factors that determine what that outer bound are are the factors that you find in subsection 1i. You know, let me cut to the chase for me. What seems to have happened here is that there was an initial estimate as to how long this species would take to regenerate without fishing mortality based upon an assumption that their fish stock was at the unfished level. And you had a plan that allowed on that assumption for an OY, or optimum yield, of 130 metric tons per year in 2000. That's correct. You then reassessed the actual factual data — I won't say on the ground, but I'll say in the sea — such that instead of 22 percent of the unfished level, it turns out you get 12 percent of the unfished level. And in response, instead of reducing the optimum yield, you increase the optimum yield to 168 metric tons. That doesn't make any sense at all to me. So the worse the fish are, the more you get to catch. It's the result of the fact that, with the new information, it was clear that this could not be rebuilt within 10 years. Well, I understand that. But the statute seems to contemplate precisely the opposite. That is to say, if it is going to take longer, your response is not allowed to be, you catch more fish. Well, it's true that if you're under 10 years, and if you're close to 10 years, you can have a very restricted situation for the fishers. But where the stock is such that the biology of the stock means you cannot rebuild in 10 years, then NMFS's outer bound, which is the total of the years with no fishing plus one mean generation time, in this case, indicated that the outer bound was a 34-year period. Now, that did result in a small increase — Small increase, you can call it small or large, from 130 to 168. But I think you have to look at the factors that Congress wanted the agency to look at. This means that the stock will be rebuilt over time, but it also — 47 years or so? 47 is the maximum time for dark blotch. Now, as I understand it, you have a 50 percent chance of achieving it in that period. Isn't that correct? 50 percent chance of achieving it in 34 years, which is the target. Oh, and a 70 percent chance. A 70 percent chance of reaching it in 47. But all of these targets are done in a probabilistic way. Even the 14 years, which is how long it would take if there were no fishing mortality at all, that's a probabilistic figure, a 50 percent sort of figure. Give me a — I'm not sure you can respond to this in a way that would help me understand it, but I noticed that the statute, in referring to the 10-year period, actually defines the 10-year period differently from the regulation or the guideline. The statute says 10 years taking into account such things as needs of the fishing community. The regulation or the guideline says 10 years in the absence of any fishing mortality. Those are two quite different concepts. Why did you move from one to the other as you moved from the statute to the guideline? Well, let's see. I guess I'm not entirely sure what part of the guideline you are focusing on. The — I mean — The guideline, as I understand it — Right. — has a certain set of criteria if the fish will regenerate within 10 years, assuming no fishing mortality. That's right. The statute, on the other hand, talks about as soon as possible and within 10 years, but not assuming no fishing mortality, but rather allowing such things as fishing in accordance with the needs of the community and a few other things. So you define the 10-year period in the guideline quite differently from the way the 10-year period is defined in the statute. Why? Well, I think that the guidelines saying that if you can rebuild within 10 years, you have to is probably the strictest possible reading of the statute here. Are you saying that the guideline says that if you can rebuild in 10 years in the absence of any fishing mortality, you must do so and have no fishing mortality? That's the way the national standard guideline now reads. Including no bycatch? That's correct. If you can do it under 10 years — Well, then how could that possibly have been allowed even 130 metric tons when the assumption was that you were under the earlier part of the guideline because you had a bycatch of 130 metric tons? Your answer can't be right. Well, the 130 metric tons was a very small level because there was only — Well, if — I believe the — when they were assuming the 22 percent, that allowed a — some room below the 10 years to allow some bycatch. The actual administrative record for that 2001 specification where — is not before since this is the challenge to 2002. So I really don't know the precise background which led them to conclude that 130 metric tons was the appropriate level. But I think the main point is that the data showed that those assumptions behind the 130 metric ton were incorrect. And with the actual data under the rebuilding plan for rockfish, 168 is an appropriate level. Now, as I read the statute, if you're — now, I'm not talking about the guideline, but I'm rather talking about the statute. As I read the statute, if the rebuilding period can be accomplished within 10 years or less, the guidelines are allowed to take into account such things as needs of the fishing community. Right. If it cannot be accomplished in that 10-year period, then there are three specified things that are allowed to be taken into consideration, environmental factors, international treaty, and one other. Wow. If you're — biological factors of the fish stock. If you are over that 10-year period, are you allowed to take into consideration the needs of the fishing community? Because that's not explicitly mentioned in the statute when you're over the 10-year period. Yes, I think so, because the things that are specifically mentioned in subsection 2 are the triggers, which mean that you can't do it in 10 years. Once those things are triggered, then you have to figure out what are the considerations in setting the length of the period. And we believe that you can go to subsection 1 to find out what those appropriate considerations are. And they are — So — and if you're — but if you're going over the period, you get to consider additional factors such as fish stock, international obligations, and so on. Is that right? Is that the way it works? Well, the — if you go over 10 — you can go over 10 years where you have one of the factors that are listed in part 2. It has to be biology of fish stocks, environmental conditions, or international agreements. Those are the things that can get you above 10. If you're there, then you have to figure out what the outer bound is going to be, and you can look to — But once you're there, are you allowed to give even greater attention to the needs of the fishing community than you were under the shorter period? That's where I'm having trouble with your position. No. You know, I think under both, you give — you balance the needs of the fishing community against the needs of the fish. But are you allowed to give greater attention to the needs of the fishing community when you're in the later period, as to say you're in the additional — the above 10-year period? No, I don't think you give greater — And why did you move from 130 to 168? Well, the — that, again, is due to NIFS's interpretation of the 10-year limit. I'm talking — I'm not talking about the guideline. Understand how the guideline operates. I'm asking a different question, which is to say I'm looking at the statute. And as I see the statute, you are allowed to look at the needs of the fishing community if you're in the under 10-year period. And I'm taking for the moment your argument that if you're over the 10-year period, you get to continue to look at the needs of the fishing community. But I see nothing in the statute that allows you, once you're over the 10-year period, to give even greater deference to the needs of the fishing community, because you've got three very specific conditions when you're above 10 years, none of them says, and greater deference to the needs of the fishing community. Which comes back to why did you move from 168 to 130 as soon as you realized the fish stock was in greater trouble? Well, you know, I think that NIMS would have if it — would have given greater consideration to the fishing communities if it could have under the other one. I mean, this is a situation where the fishing communities have been severely impacted. And if — the problem being that these rockfish tend to congregate together so that the underfished species are swimming with the healthy — the overfished are swimming with the healthy ones and you can't avoid bycatch. So what NIMS is trying to do is rebuild these stocks, but at the same time not have a draconian kind of result where you'd have to stop fishing on healthy stocks just to avoid the bycatch of the overfished species. Let's assume that you've set an optimum yield of 130 or 168, or as we've seen with these other species, a different level, but as it turns out, the fishing allowed miscalculates and you catch — and there's more catching of species than 130 or 168. What happens to that additional amount that's caught? Is it thrown overboard? Is it nonetheless economically valuable and brought in and sold by the fishermen? Just what happens in that event? It can be economically sold, yes. So there's no punishment — I don't mean punishment in the sense of sort of a ticket written, but there's a reward for going over in the sense that you get to sell the fish you catch even though they're above the optimum yield? Well, some years they go over, some years they go under. But my short answer is they get to sell them. They can sell them. NIMS takes account of those overages and underages when it does a stock assessment and then it looks at both the fishing data from the commercial fisheries, but more important, I think the trawl surveys gathers all the information it can about these fish stocks to determine whether it needs to adjust the rebuilding plan, period. But just going by the number of tons caught is a snapshot on just one partial aspect of the fishery. After all, these fishing rates that are being allowed here are very small. For dark blotch, it's 2.9 percent of the fishing stock. So the fact that — 2.9 percent of what fishing stock? The entire biomass of dark blotch rockfish. So the fact that fishers are reporting a certain amount which may go over or under the 168 is not all that significant. And what's the average generational length for dark blotch? 34 years? Is that right? Well, let's see, it's 33 years and that was added to the 14. So you're allowed to catch 2.9 percent of the existing stock of those fish every year and it takes an average of 33 years for it to regenerate in one generation. At that rate, you're not going to get dark blotch regeneration very fast. Well, under this plan, it should get up to what's called the maximum sustained yield level within the target period of 34 years or 47 years if we take the 70 percent probability. It should, yeah, 50 percent or 70 percent probability, yeah. But that way, the stocks are rebuilt over time but you don't have the draconian effects on the fishing communities and we think that the statute does allow us to consider the needs of fishing communities. Could you answer a question for me? This case has been argued and posed at least as I read the briefs as sort of an either or. The plaintiffs would like to shut down fishing for 14 years to accomplish the rebuilding and the application here would extend it out 40 some odd years, 30 some odd years at least. Were no alternatives, intermediate alternatives considered either in the comment period when we're talking about the methodology that EMS is using or in connection with his case in particular, with his situation in particular? Or may I add, has there been any attempted mediation? Well, the not formal mediation, but certainly the counsel listens to all suggestions and when this national standard guideline went out for notice and comment, the plaintiffs did comment and their alternative was the no fishing. But were there others who were advancing some intermediate position? I don't believe there were. The NMFSS methodology, I suppose, allows different rebuilding periods depending on both the biology of the stock and the needs of the fishing community. So it doesn't have to be set at either the maximum or the 50 percent. It can be set within that period based on these other factors, but it is pretty much within the discretion of the agency where to set it. There are other measures that are taken every year to make sure that unnecessary bycatch doesn't happen. And as counsel has mentioned, there are things like rockfish conservation areas that are set aside and so forth. So to that extent, those sorts of options have been considered and to some extent implemented. But the OIs themselves are set on the basis of this rebuilding analysis. Because the reason I'm asking is that where the statute seems to command what would be your draconian result if it's within a 10-year period, that is, if it could have been rebuilt, it would have commanded a shutdown of fishing. Is that not correct? The NMFSS interpretation is that, yes. So suddenly when the anomaly here, the counterintuitive result is that if you can edge it past the 10 years, then you can extend it and, in fact, as applied, increase the optimum yield in the first year of the new application. It just sort of boggles the mind given the stated purpose of the act, which is to remedy the overfishing and to put pressure on the restoration, recognizing there may be some short-term impact on the fishing industry, but explicitly stating Congress's intent to take the long-term view because the overfishing is, in fact, going to long-term destroy the fishing industry. And that, you know, when you take that congressional mandate and then you just see what happens as applied, it's hard to believe that the choice is simply going from the draconian result, as you've described, to one that extends it out decades and increases the immediate short-term fishing, that there's no intermediate position that doesn't emerge that balances out, brings it closer to the 14 years, if not on a draconian basis, at least some lesser or less permissive, if you will, methodology. Yeah. NIFS actually is going to be doing a new rulemaking on this National Standard Guideline, and that could be certainly one of the considerations that it looks at is if there is some middle ground here. That rulemaking is scheduled to start this spring. But I think we're all, everyone's in agreement that Congress wants these stocks rebuilt. But here, I think the agency has chosen a reasonable balance between rebuilding and economic effects. And as I recollect the statute, Congress wants them rebuilt in, quote, as short a time as possible, close quote. Not just rebuilt, but quickly. It does say as short a time as possible, but then it says considering a number of factors, one of which is needs of communities that want to take the time. Mr. Shelton, you've tried very hard to save three minutes for your co-counsel Mr. Walsh, but we have prevented you from doing so. We'll give him three minutes. Thank you. Unless he's content with what you've already said. Well, maybe most of those questions were directed at me. Let me say a couple of things. Number one, there is an outer limit if it doesn't make 10 years. The agency has placed an outer limit. The outer limit is a mean generation time. It has a rational basis. It has a rational basis that permits more fishing for the species, the more trouble the species is in. Well, Your Honor, I think that the problem with 10 years, the problem with 10 years is that it wasn't written by biologists. Well, it may not have been. And so what they did, well, I have to admit that I wrote the first part of the statute when I worked for the Senate. So I have some sense of what they were thinking about. You worked for Senator Magnuson? I worked for Senator Magnuson. I wrote this bill the first time. I thought I got it right. In any event, what happened then is that we said we should try to maximize the sustainable yield of each fishery. But then we thought about that and said, no, you cannot maximize the production of a mixed stock fishery. Because what you're going to do is you're going to drive down another stock while you're maximizing that fishery. So we created optimum yield, which turned out to be too loose. And it led to New England. And in this case, in the Pacific fishery, what happened is that we found out that the science was telling us we were wrong. There was decadal changes, and there was overfishing. So what's happened in the last six, seven years. What was the first kind of change? Decadal change, where the ocean changes. The ocean conditions change, actually. And so we can't see this coming. We're not that good at it. We can't see into the water. So what we've been doing is we've been cutting this fishery back. We've cut it back by 45%, maybe more. We're going to cut it back more. And we have a complex situation. And you're talking about it with the Boccaccio. Well, I cannot speak for the mathematician that created the model. These are all models. And so when they do regression analysis, they can calculate how they get to where they want to be. And it would appear irrational at the start. But that's the function of the biological model that they work with. It is you cannot look at it just very simply and say 130, 160. That makes no sense. Because it's a regression analysis. It's a biological calculation. You have to have some confidence that the agency is doing it right. It may be theoretical, but as applied, those optimum yield numbers are real numbers. They're real numbers. However, whatever the garbage in, garbage out syndrome may be, if it that's the problem, that the number, the model, or the regression model that's adopted doesn't work as applied, do we not take that into account when? The next time. Absolutely. And then we cut back. And that's what they've been doing. If you look at the fishery management regulations that we cited in our footnotes, the things they've done. You say you cut back when you discover the species is in more trouble? Yes, absolutely. They will. What happened with the dark black rockfish then? Well, because in that case, the regression analysis, because of the age of the fish stock and the biology, you could stretch it out, catch more, and still reach your objective. I'm asking you a much simpler question. You've said that if the species is in more trouble, you cut back on the fishing. Here, however, you learn the species is in more trouble. It's 12 percent instead of a 22 percent of the unfished stock. And in response, you increase the catch. Well, then in every instance, you don't need to cut it back if the biologists will tell you that a certain fishing level will still get you to your objective. This sounds like, with all due respect, this sounds like gibberish. Because you still haven't persuaded me. I've made that argument, Your Honor, but I've never won against the government. This is the first court I've come to where a court has said that. I usually challenge them. I apologize for using that term. I should be on the other side. But it doesn't seem to me yet responsible, I'll say it that way, to when I Your two statements simply aren't consistent. You're saying, well, if they're in trouble, we cut back. In the context of the biology, Your Honor, in the context of the biology where courts must defer to the expert agency, Drew would like this to go back and have a judge regulate this fishery. This is a complex question. There is an elaborate process. Who would like to have a judge regulate the fishery? Drew would like it to go back and have a remedy phase so that the district court judge is going to make a decision about how much dark blotch should be taken. And I think that the court should avoid that. They should not be regulating this fishery. You should make a decision as to whether the fishery is going in the right direction, whether on balance this agency has complied with every major clear prescriptive directive, and let it go at that if there's no evidence that they have made an irrational decision. And I don't think that's the case. Ginsburg-Miller What if the evidence is that they have made an irrational decision? Kennedy Well, I don't believe they presented that. They're making an argument on the statute that somehow this looks bad on its face. But they haven't come in with a biologist that said we reported this in the peer literature, and they ignored it, and they're wrong. It can't be 47 years. They haven't said that. They basically come in and take in a very clever argument on the face of the statute and say this can't make any sense. There's no biology behind their argument. Ginsburg-Miller Counsel, you said the court should stay out of this, but you're assuming that the courts agree with the regulations. Assume the courts feel that they are irrational. Kennedy Then you're going to overturn it and send it back to the agency to do it over again. Ginsburg-Miller Okay. Thank you. Kennedy Which is what I'm arguing against here today. Thank you. Kennedy You're arguing against sending it back to the agency? Kennedy I'm on the side of the government today. I would like you to affirm this regulation. There's no question that if you make this ruling with regard to dark blotch, there is no practical way to separate some of these other stocks that are in a similar position and that you're talking about a fairly major shutdown of the fishery for 14 or longer years. I mean, you might as well just sit and watch and wait for it to come back. And what people are trying to do here is maintain enough of a small industry for the And that's where we stand. Roberts Thank you. Kennedy All right. Roberts You've saved a little time. Thank you. Many of the panel's questions have been practical questions about the effect of stopping fishing. I fully appreciate those questions. They are perfectly valid questions. They obviously affected the district court. Let me say a few words about the effect of what the plaintiffs are looking for here. First of all, as Judge Fischer pointed out, everyone agrees in reading the statute that in some circumstances you have to shut all fishing down for a long period of time. If it's possible to rebuild within 10 years, shutting down all fishing, and it takes 10 years in order to rebuild, everyone agrees that the statute requires a 10-year fishing moratorium. It's not a rational reading of the statute for everyone to acknowledge that it's reasonable for the statute to shut down fishing for 10 years, but not for 14 years. That's the first point. The second point is, Judge Nelson asked, has there been mediation? Does this, you know, why do we have just these two extremes? I'm going to answer Judge Nelson's question directly. I'm going to speak slowly in case the Court wants me to stop, because I don't want to talk about settlement issues in a way that's inappropriate. There was mediation in this case. The district court sent us to a magistrate judge who was familiar with this fishery, and it was clear that the district court wanted us to settle this case. I'm going to speak especially slowly now. There was a settlement offer made as part of that mediation. One party made a settlement offer. The party that made that settlement offer was the plaintiffs. Now, the Court could read into that, and I hope the Court would. I don't think we want to read into the mediation. I think you have, at least from my standpoint, don't think you should breach the confidentiality of who you're proceeding. Let me wade back into the statutory interpretation issue. Judge Fletcher, I understood some of your questions. This may be a misunderstanding of what you were saying, as suggesting that subparagraph 1 and subparagraph 2 are sort of alternative requirements, one applying if it's possible to rebuild within 10 years, and the other subparagraph applying if it's not possible to rebuild within 10 years. If I understood you correctly, I'd like to suggest that that's not what the statute requires. The statute requires the agency to comply with both subparagraphs. The agency's interpretation always gets back to the same point, which is a simple balancing test. And we submit that this prescriptive set of requirements is Congress's desire to get rid of that old balancing test from pre-'96 and create instead a set of criteria. We win here, even if we don't persuade you that subparagraph 2 stops the agency from adding time to a rebuilding period once they're past the 10-year limit, because even if we're wrong about that, and I've spent most of my time arguing today why we're right, so I won't repeat that, the agency still has to comply with subparagraph 1. And what subparagraph 1 says is that the rebuilding period has to be as short as possible. And the agency conclusively proved in 2001 that it was perfectly possible to have a 130-metric ton fishing harvest limit in this fishery. It's unarguable from the record that that was a possible level of fishing. And because it's considerably lower than the level that the agency adopted for 2002, that decision by the agency can't stand even on subparagraph 1. I'm not sure that's true. Let me see if I understand it. If you accept that that, when there, if the, under subparagraph 2, the triggers are satisfied to let them go beyond the 10 years, then you revert back to paragraph 1. It says, shall be as short as possible, taking into account the status of the biology and the needs of the fishing community. So if, in fact, they go, they're now outside the 10-year range, how is it that the you jump from the 14-year period, which is a no fishing period, to the notion that you can, that that's all they get to do. They basically get to push out the shutdown, the total shutdown from 10 to 14 years. The argument I just made, Judge Fischer, was not an argument that necessarily gets me to no fishing. It is an argument that gets me to a ruling by this Court that the agency's decision to increase the fishing catch level from 130 metric tons to 168 metric tons violated the statute. And you're exactly right, Your Honor, that subparagraph 1 doesn't just say as short as possible. It lists a set of criteria, some biologic and some economic. But the agency decided in 2001 that 130 metric tons, a catch level much lower than in 2002, was economically possible and biologically possible. So if it was possible for 2001, at the barest minimum, this is a fallback argument, but at the barest minimum, it's possible for 2002. One other point. Mr. Shilton said that there have been overharvests here, but that the overharvests are not insignificant. That is not factually accurate, given the evidence in the record. We have experiences here of overharvests that are so high that they are literally double the actual fishing quota. And it's also not, that statement is also not reflected in the record as a matter of science, because what the record says is that with very overfished species like these species, small overharvests can matter. They can matter in the sense of delaying rebuilding, and they can matter in the sense of making it less likely that rebuilding will succeed. What I'd like to close with, Your Honors, is a point I said earlier. If the Magnuson-Stevens Acts rebuilding requirements mean anything, they have to mean that the agency can't weaken protections for an overfished species, particularly where the agency just learned that that species is in much worse condition than previously understood. Because that's what the agency did here, we ask that this Court reverse the district court's summary judgment ruling and remand the case to the agency, to the court, to the district court, for further proceedings on remedy.  Thank you. Thank you very much. For a good argument on both sides, National Resources Defense Council versus National Marine Fisheries Service is now submitted for argument. We are in adjournment for today. We will reconvene tomorrow at 9 o'clock, although I suspect none of you will be here. Thank you all. Very good argument. Thank you.  Thank you. Thank you. Thank you.
judges: D.W. Nelson, W. Fletcher, Fisher